WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary E. Koriel,<br><br>          Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>          Defendant. | No. CV-13-01531-PHX-BSB<br><br>**ORDER** |

Mary E. Koriel (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Local Rule of Civil Procedure 16.1. For the following reasons, the Court reverses the Commissioner's decision and remands for benefits.

**I.    Procedural Background**

On August 26, 2009, Plaintiff applied for supplemental security income under Title XVI of the Act. (Tr. 231-39.)[1] Plaintiff alleged that she had been disabled since January 1, 2003. (*Id*.) Plaintiff later amended her disability onset date to August 14, 2009. (Tr. 25.) After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an

---

[1] Citations to "Tr." are to the certified administrative transcript of record. (Doc. 19.)

administrative law judge (ALJ). After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act. (Tr. 25-34.) This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council). Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

**II.    Medical Record**

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health. The record also includes a lay opinion and opinions from state agency physicians who examined Plaintiff or reviewed the records related to her health, but who did not provide treatment.

    **A.    Medical Treatment**

        **1.    Lauren Bonner, M.D.**

On June 9, 2004, Plaintiff sought treatment from Dr. Bonner for symptoms of psychological disturbance. (Tr. 390-91.) Plaintiff reported that she was attending a drug diversion program and was taking prescribed medications secondary to intrusive memories of a rape. (*Id.*) Dr. Bonner assessed major depressive disorder, posttraumatic stress disorder (PTSD), opiate dependence in full remission, and somatization disorder. (*Id.*) Dr. Bonner assessed a Global Assessment of Functioning (GAF) score of 50. (*Id.*) Later that same month, Dr. Bonner assessed a GAF score of 47-48. (Tr. 384.)

On February 18, 2004, Plaintiff reported that she was afraid to attend counseling related to the drug diversion treatment because she had difficulty discussing her feelings with strangers. (Tr. 381.) On February 27, 2004, Dr. Bonner noted that Plaintiff exhibited passive behavior and symptoms of anxiety, depression, helplessness, and low self-esteem. (Tr. 379.) Plaintiff reported that she was paranoid, depressed, and had trouble sleeping. (Tr. 377.) Dr. Bonner noted that Plaintiff's compliance with medication was "poor" because she had taken more than the recommended dose of Klonipin. (*Id.*)

On April 12, 2004, Dr. Bonner noted that Plaintiff's condition was not improving with medication. (Tr. 375-76.) On April 29, 2004, Plaintiff was tearful, irritable, and dysphoric. (Tr. 369-70.) Plaintiff wanted to change anti-depressant medication to try to reduce her symptoms. (*Id.*) Dr. Bonner continued to treat Plaintiff throughout 2004 for depression and PTSD, and a possible eating disorder. (Tr. 354-68.) She noted that Plaintiff often presented in a dysphoric mood, sometimes missed appointments, refused counseling except for a women's group, and self-adjusted her medication. (*Id.*)

### 2. NOVA

In July 2005, a nurse practitioner (NP) at NOVA examined Plaintiff and confirmed a history of anxiety, panic, anger, decreased concentration, and suicidal ideation. (Tr. 406-08.) Plaintiff reported auditory and visual hallucinations. (*Id.*) Plaintiff presented with an agitated labile affect, and was anxious and depressed. (*Id.*) She exhibited occasional loose associations, circumstantial speech, and a sense of diminished worth. (*Id.*) The NP opined that Plaintiff had bipolar disorder and possible negative effects from prescribed medications. (Tr. 409-10.)

On October 3, 2005, Plaintiff reported daily headaches, an inability to concentrate, tearfulness, and a flat, anxious, and agitated affect. (Tr. 401-02.) The NP diagnosed Plaintiff with bipolar disorder and schizoaffective disorder. (*Id.*)

### 3. John Koryakos, M.D.

In 2004, Plaintiff began treatment with Dr. Koryakos for physical and psychological issues. (Tr. 493-94.) On June 24, 2004, Dr. Koryakos noted that Plaintiff had chronic pelvic pain, depression, insomnia, headaches, chronic lower back and hip pain, and gastrointestinal upset. (*Id.*) Dr. Koryakos continued to treat Plaintiff for these issues, and also noted insomnia and a possible eating disorder. (Tr. 476-92.)

In September 2005, Dr. Koryakos saw Plaintiff for a medication refill. (Tr. 473.) Plaintiff reported pain and numbness in her fingers of both hands, and tenderness in her lumbar paraspinal muscles. (Tr. 473.) On October 26, 2005, Dr. Koryakos noted that Plaintiff continued to experience insomnia, headaches, and side effects from her

1 medications.  (Tr. 474.)   From November 2005 through January 2006, Dr. Koryakos found that Plaintiff also had ongoing pelvic pain, and gastroesophagel reflux disease (GERD) symptoms.  (Tr. 471-72.)

In 2006, Dr. Koryakos continued treating Plaintiff for back and neck pain, body pain, joint pain, hip pain, and knee pain.  (Tr. 469.)   Plaintiff reported tingling and numbness in her left leg and the tips of her fingers.  (*Id.*)  An MRI of Plaintiff's cervical spine on April 5, 2006 showed "mild left neural foraminal narrowing at C5-6 secondary to degenerative disc disease and mild facet arthropathy."   (Tr. 509-10.)   Throughout 2006, Dr. Koryakos treated Plaintiff for pelvic and body pain, numbness and tingling in her left arm, insomnia, anxiety, and pain in her shoulders.  (Tr. 459-68.)

On April 16, 2008, Dr. Koryakos treated Plaintiff for increased low back pain after a fall.  (Tr. 453.)   On May 9, 2008, Plaintiff reported diffuse pain in all of her joints. (Tr. 452.)   She had positive trigger points in her thoracic and lumbar spine, and fatigue. (*Id.*)  Dr. Koryakos "suspect[ed]" fibromyalgia.  (*Id.*)  On June 24, 2008, Dr. Koryakos noted that Plaintiff had stomach upset and heart palpitations from Neurontin, and noted that Neurontin was not controlling Plaintiff's pain.  (Tr. 449.)   Plaintiff continued to report chronic body and joint pain.  (*Id.*)  Dr. Koryakos assessed arthralgia, myalgias, and "F.M." (fibromyalgia).  (*Id.*)

Laboratory tests on October 9 and November 2008 showed that Plaintiff had low red blood cell counts, low hemoglobin, and low hematocrit.   (Tr. 498-500.)   On November 19, 2008, Dr. Koryakos noted that Plaintiff experienced pain in her arms and legs, headaches, bloating, positive trigger point tenderness, and bulimia.  (Tr. 448.)

On March 6, 2009, Dr. Koryakos treated Plaintiff for a headache that had been present for two weeks and was not responding to Imitrex.  (Tr. 447.)   Dr. Koryakos treated Plaintiff for headaches and body pain on April 2, May 6, and May 18, 2009. (Tr. 444-46.)

In 2008 and 2009, Dr. Koryakos treated Plaintiff for headaches, fibromyalgia, bloating, abdominal pain, low iron levels, dizziness, medication side effects, upper back pain, GERD, and fatigue. (Tr. 517-45.)

In 2009, Dr. Koryakos continued treating Plaintiff for body pain, GERD, dizziness, balance problems, and fibromyalgia. He also noted that Plaintiff had lost her insurance and was having difficulty affording medication. (Tr. 713-26.)

In 2010 and 2011, Dr. Koryakos continued treating Plaintiff for fibromyalgia pain, joint pain, pelvic pain, abdominal pain, and GERD. (Tr. 882-903.)

### 4. Michael Steingart, M.D.

On June 5, 2006, orthopedic surgeon Dr. Steingart examined Plaintiff and noted that she had whole body pain, laxity in her left shoulder, and positive Tinel's and Phalen's signs in her left wrist. (Tr. 789-90.) An MRI of Plaintiff's cervical spine on July 17, 2006 showed a mild disc bulge and posterior spondylytic changes at C4-5, C5-6, and C6-7. (Tr. 792.) The MRI also showed mild multilevel degenerative disc disease and loss of normal cervical lordosis with reversal of curvature centered at C5. (*Id.*) Dr. Steingart continued treating Plaintiff for left shoulder and neck pain, noting that he suspected a glenolabral tear in the left shoulder. (Tr. 786-87.) He noted that Plaintiff had anxiety disorder which prevented "invasive testing." (Tr. 786.) Dr. Steingart prescribed Valium for Plaintiff to allow him to perform diagnostic tests. (*Id.*) A July 21, 2006 EMG of Plaintiff's upper extremities revealed mild right median neuropathy at the wrist. (Tr. 795-96.) On December 21, 2006, Dr. Steingart treated Plaintiff for bilateral wrist and left shoulder pain. (Tr. 784.)

An arthrogram of Plaintiff's left shoulder on March 29, 2007 was essentially normal. (Tr. 798-99.) An MRI that same day showed mild left acromioclavicular (AC) arthorsis. (Tr. 791.) On April 20, 2007, Dr. Steingart opined that Plaintiff needed physical therapy for her shoulder. (Tr. 780-81.) She had positive impingement signs and trouble lifting her left arm upwards. (*Id.*)

### 5. Pattabi Kalyanam, M.D.

On referral from Dr. Koryakos, on June 5, 2007, Plaintiff saw neurologist Dr. Kalyanam at the Arizona Pain Center. (Tr. 419.) Plaintiff reported left neck pain, left arm pain, low back pain, and episodes of numbness and tingling. (*Id.*) On review of an MRI, Dr. Kalyanam found evidence of mild left neurforaminal narrowing of Plaintiff's cervical spine, and mild facet arthropathy. (Tr. 421.) Dr. Kalyanam noted that Plaintiff had a diminished range of motion in her left arm due to pain, and diminished muscle strength and tone, and diminished deep tendon reflexes in her left arm and right leg. (Tr. 420.) Plaintiff had a "positive" facet joint examination bilaterally at L3, L4, L5, and S1. (*Id.*) "SI joint tenderness [was] positive bilaterally," and trigger points were positive over both trapezium muscles and the upper and lower back. (*Id.*) Plaintiff's hand grip was diminished on the left. (*Id.*) Plaintiff's left arm was positive for allodynia. (*Id.*) Dr. Kalyanam opined that Plaintiff had cervical radiculopathy, left arm acromioclavicular arthritis, lumbar radiculopathy, and possible carpal tunnel syndrome in her left arm, and depression. (Tr. 420.) Dr. Kalyanam scheduled Plaintiff for cervical epidural steroid injections and bilateral trapezius muscle trigger point injections. (*Id.*)

### 6. New Arizona Family Clinic

From August 2008 through October 2009, Plaintiff obtained mental health treatment from providers at the New Arizona Family Clinic (Family Clinic) for suicidal ideation, anxiety, history of sexual abuse, depression, psychosis, substance abuse, and attention deficit hyperactivity disorder (ADHD). (Tr. 549-672.) Treatment providers frequently changed Plaintiff's medications due to side effects or ineffectiveness. (*Id.*) Plaintiff reported constant suicidal ideation, decreased concentration, crying spells, and auditory hallucination. (*Id.*) She reported that she could only complete minimal activities of daily living. (Tr. 549-672.) On October 14, 2009 NP Nancy Mullins noted that Plaintiff appeared startled and was rocking back and forth in her chair. (Tr. 660.) Treatment notes indicate that Plaintiff continued to present with depression throughout

2009 and into 2010, at which point her health insurance was cancelled due to her inability to work. (Tr. 699-702.)

Plaintiff continued to receive treatment for anxiety and depression at the Family Clinic from 2010 through May 26, 2011. (Tr. 805-11.) Treatment providers noted that Plaintiff was tearful, had suicidal ideation, was irritable, and had no joy in her activities. (*Id.*)

### 7. Hospitalization

From July 21, 2011 through August 4, 2011, Plaintiff was hospitalized for suicide ideation and mental health treatment. (Tr. 912-21.) At the time of admission, Plaintiff had symptoms of depression, poor hygiene, and was in moderate distress. (*Id.*) She had a GAF score of 45. (Tr. 920.) On discharge, Plaintiff described her mood as "good," she was goal oriented, had "good concentrating ability," denied anxiety, hallucinations, and delusions. (*Id.*) She had no suicidal ideations and had fair insight and judgment. (*Id.*) Dr. Sandra McDonald identified Plaintiff's diagnoses as major depressive disorder, obsessive compulsive disorder (OCD), and borderline personality traits, and assessed a GAF score of 55-60. (Tr. 909.)

## B. Medical and Lay Opinion Evidence

### 1. Dr. Koryakos

On July 15, 2009, Dr. Koryakos completed a Medical Assessment of Ability to do Work-Related Physical Activities. (Tr. 515.) He opined that Plaintiff could sit, stand, and walk for two hours each in an eight-hour work day, and that she could lift less than ten pounds. (*Id.*) He identified Plaintiff's diagnoses as chronic back and body pain, fibromyalgia, headaches, attention deficit disorder (ADD), anxiety, and depression. (*Id.*)

On December 10, 2009, Dr. Koryakos completed another assessment of work-related physical activities. (Tr. 696.) He opined that Plaintiff had limitations consistent with those he identified on July 15, 2009. (*Compare* Tr. 515-16 *with* Tr. 696-97.)

In June 2011, Dr. Koryakos completed another assessment of work-related

physical activities. (Tr. 326.) He opined that Plaintiff had limitations consistent with those he identified in 2009. (*Compare* Tr. 515-16 and Tr. 696-97 with Tr. 326-27.)

### 2. John Prieve, D.O.

On March 13, 2010, state agency physician Dr. Prieve examined Plaintiff for her application for benefits. (Tr. 728.) He noted that Plaintiff had a history of chronic pain, depression, and anxiety, and that she needed to change positions frequently. (Tr. 728.) He noted Plaintiff's report that she dropped things due to wrist pain. (*Id.*) Dr. Prieve noted that Plaintiff had a flat affect. (Tr. 729.) He found diffuse tenderness in her spine, a decreased range of motion in the cervical spine, lumbar spine, and hips. (Tr. 730.) She had a positive response to sixteen of eighteen fibromyalgia trigger points, and positive Tinel's and Phalen's tests in her left wrist. (Tr. 731.) Dr. Prieve diagnosed fibromyalgia, left carpal tunnel syndrome, depression, and anxiety. (*Id.*) He opined that Plaintiff could stand or walk at least two hours, but less than six hours, in an eight-hour day (four hours intermittently). (*Id.*) He also found that Plaintiff could sit for at least two, but less than six hours a day (four to six intermittently), and lift up to ten pounds occasionally and frequently. (Tr. 731-32.) He opined that Plaintiff could occasionally climb, stoop, kneel, and crouch, handle, finger and feel with her left hand. (*Id.*)

### 3. Greg Peetoom, Ph.D.

On March 22, 2010, Dr. Peetoom examined Plaintiff as part of her application for benefits. (Tr. 734.) He noted Plaintiff's history of depression, anxiety, difficulty concentrating, and ADHD. (*Id.*) He also noted that Plaintiff had panic attacks, had attempted suicide several times, and had been hospitalized for psychiatric treatment twice. (*Id.*) On examination, Plaintiff incorrectly identified the season, could not complete the serial seven's test accurately, missed items during recall testing, and misunderstood test instructions. (*Id.*) She appeared drowsy and lethargic and needed instructions repeated. (Tr. 736.)

Dr. Peetoom noted that Plaintiff's diagnoses included dysthymic disorder, generalized anxiety disorder, and ADHD with opioid dependency. (*Id.*) He opined that

Plaintiff had some limitations in her immediate memory, concentration, and attention. (Tr. 737.) He opined that Plaintiff could understand and remember simple work-related instructions and procedures, complete simple tasks, and interact appropriately with supervisors and co-workers. (Tr. 738.) He also opined that Plaintiff would have difficulty with more complex tasks and working consistently with the general public. (*Id.*)

### 4. Jean Goerss, M.D.

During the administrative proceedings, state agency physician Jean Goerss, M.D., reviewed the record and opined that Plaintiff retained abilities consistent with light work, including the ability to stand and walk for at least six hours in an eight-hour workday sit for about six hours in an eight-hour workday, and lift and carry twenty pounds occasionally and ten pounds frequently. (Tr. 763-70.)

### 5. Linda Jidou

For Plaintiff's application for benefits, Plaintiff's sister, Linda Jidou, submitted a Function Report describing Plaintiff's limitations. (Tr. 328.) She stated that Plaintiff needed encouragement to get up and get dressed. (*Id.*) She described Plaintiff as being in constant pain, forgetful, and extremely fatigued. (*Id.*) Jidou indicated that Plaintiff preferred to be alone, had trouble sleeping, needed help with basic hygiene, and needed reminders to eat and shower. (Tr. 329-330.) She also noted that Plaintiff was sometimes too anxious to leave the house and was not motivated to perform household chores. (Tr. 331.) Jidou also noted that Plaintiff had difficulty lifting, standing, reaching, walking, sitting, remembering, completing tasks, following instructions, and getting along with others. (Tr. 333.) She indicated that Plaintiff was often depressed, tired, confused, anxious, and in a lot of pain. (*Id.*)

## III. Administrative Hearing Testimony

Plaintiff was in her early forties at the time of the administrative hearing and the ALJ's decision in June 2012. (Tr. 44.) She had an eleventh grade education and past relevant work as a waitress. (*Id.*) Plaintiff testified that she had panic attacks and

1 sometimes had to pull over when she was driving to wait for the attacks to pass. (Tr. 50.)
2 Plaintiff reported that near the end of her last job she was often absent due to depression
3 and anxiety. (Tr. 51.) She stated that getting out of bed, getting dressed, and trying to
4 talk to people about finding work caused too much anxiety. (Tr. 52.) Plaintiff also
5 testified that she had pain from fibromyalgia, carpal tunnel syndrome, and other
6 impairments. (Tr. 53.) She had radiating pain, migraines, and daily tension headaches.
7 (*Id.*) Plaintiff testified that she had difficulty getting out of bed due to pain and
8 depression, and that she preferred to be left alone. (Tr. 58.) She avoided grocery
9 shopping because she felt like others were staring at her or talking about her. (*Id.*) This
10 feeling had caused her to abruptly leave the store. (Tr. 59.) She also testified that she
11 had carpal tunnel syndrome in her left hand, which caused a tendency to drop things.
12 (Tr. 65.)

13 Plaintiff estimated that she could sit for about thirty minutes at a time, and stand or
14 walk for ten minutes at a time. (Tr. 67.) She could lift a gallon of milk with her right
15 hand. (Tr. 68.) Plaintiff was afraid to leave home because of her anxiety. (Tr. 69-71.)
16 She napped throughout the day and was uncomfortable in any position. (Tr. 75-76.) She
17 had trouble concentrating because her mind raced. (Tr. 72.) Plaintiff was afraid to return
18 phone calls, did not socialize, and sometimes did not shower. (Tr. 73.) Plaintiff testified
19 that she did not care if she lived or died. (Tr. 75.)

20 Vocational expert Ms. Tolly testified at the administrative hearing.[2] (Tr. 79.) She
21 identified Plaintiff's past relevant work as a waitress. (*Id.*) In response to a question
22 from the ALJ, she testified that an individual with the limitations identified by
23 Dr. Koryakos, who could sit or stand for two hours in an eight-hour work day, could not
24 maintain competitive employment. (Tr. 80-81.)

25 The ALJ also asked the vocational expert to consider a person with limitations
26 identified by Dr. Goerss, with a light exertional level, and with the ability to lift ten

---

[2] The vocational expert's first name does not appear in the transcript of the administrative hearing. (Tr. 41-103.)

- 10 -

pounds occasionally and frequently with the left hand, and ten pounds frequently and twenty pounds occasionally with the right hand, occasionally climb ramps and stairs, frequently balance, stoop, kneel, crouch and crawl, unlimited reaching and feeling, unlimited handling and fingering with the right hand and occasional handling and fingering with the left hand, who must avoid concentrated exposure to hazards, and was limited to simple, routine, repetitive task, a low stress position (occasional decision making and changes in the work setting), and occasional contact with the public. (Tr. 81-82.) In response, the vocational expert testified that a person with those limitations could perform the positions of parking lot attendant, photocopy machine operator, and ticket seller. (Tr. 83.)

On further questioning, the vocational expert testified that a person with those limitations would not be able to perform the job of ticket seller because of the limitation to occasional public contact. Therefore, the vocational expert substituted the position of night guard for ticket seller, noting that this position was available in reduced numbers. (Tr. 85.) In response to questions from Plaintiff's attorney, the vocational expert testified that the job of parking lot attendant would require "occasional to frequent" public contact. (Tr. 87-88.) The vocational expert testified that the occupations of night guard and apparel stock checker would be more appropriate; however, the job of apparel stock checker would require "occasional to frequent" handling with the non-dominant hand. (Tr. 88-89.) The vocational expert testified that the position of photocopying machine operator could involve frequent contact with the public depending on the type of business, and testified that the job would be available in reduced numbers for someone who was limited to occasional public contact.[3] (Tr. 91-92.)

The vocational expert testified that if an individual had to leave work several times a week due to panic attacks, that person would not be able to maintain sustained work. (Tr. 97-98.) She also testified that a person generally could not be absent more than one

---

[3] When asked, "Okay, you did reduce the numbers," the Tolly stated, "Yeah." (Tr. 91.)

day each month and maintain employment. (Tr. 98-99.) She also testified that a person with moderate impairment in the ability to complete a normal work week without interruptions would be unable to maintain employment. (Tr. 99-100.)

**IV.    The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits). To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her disability is severe. 20 C.F.R. § 404.1520(a)(4)(i) and (ii). If a claimant meets steps one and two, she may be found disabled in two ways at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is presumptively disabled. If not, the ALJ determines the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e). At step four, the ALJ determines whether a claimant's RFC precludes performance of her past work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education. 20 C.F.R. § 404.1520(a)(4)(v). If

1   the government does not meet this burden, then the claimant is considered disabled
2   within the meaning of the Act.

### B.    The ALJ's Application of Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2008, the alleged disability onset date. (Tr. 27.) At step two, the ALJ found that Plaintiff had the following severe impairments: "carpal tunnel syndrome, depression and anxiety (20 C.F.R. 416.920(c))." (*Id.*) At the third step, the ALJ found that the severity of those impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ next concluded that Plaintiff retained the RFC "to perform light work as defined in 20 C.F.R. § 416.967(b) with lifting and carrying [limited] to 10 pounds frequently and 20 pounds occasionally, [and] sitting standing, and walking [limited] to 6 hours per 8-hour day." (Tr. 29.) The ALJ further found that Plaintiff should not climb ladders, ropes, or scaffolds, and that she could occasionally climb ramps or stairs. (*Id.*) The ALJ found that Plaintiff should not stoop or crawl. (*Id.*) He found that Plaintiff had "limited" overhead reaching, handling, and fingering with her right upper extremity, and that she could frequently finger and reach with her left upper extremity. (*Id.*) The ALJ further found that Plaintiff should avoid exposure to hazardous machinery and heights. (*Id.*) Finally, he found that Plaintiff was limited to "simple, repetitive tasks in a low-stress work environment with no more than occasional changes in the workplace setting and occasional contact with members of the general public." (*Id.*)

At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. 33.) The ALJ concluded that Plaintiff could perform other work that existed in significant numbers in the national economy including parking lot attendant, photocopier, and ticket salesperson. (Tr. 34.) Accordingly, the ALJ found that Plaintiff was not disabled under the Act.

## V. Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

## VI. Plaintiff's Claims

Plaintiff argues that the ALJ erred by rejecting Dr. Koryakos's opinions, her symptom testimony, and the lay witness statement. (Doc. 25 at 14-23.) Plaintiff also argues that the ALJ's step-five determination is not supported by substantial evidence. (*Id.* at 25.)

### A. Weighing Medical Source Opinions

In weighing medical source evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion. *Id.* The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

### B. Weight Assigned Dr. Koryakos's Opinions

Dr. Koryakos completed three assessments of Plaintiff's ability to perform work-related physical activities. (Tr. 515-16, 696-97, 326-37.) Dr. Koryakos consistently found that Plaintiff was limited to sitting, standing, and walking for two hours in an eight-hour day. (*Id.*) The ALJ rejected Dr. Koryakos's opinions. (Tr. 32.) He explained that Dr. Koryakos's opinions that Plaintiff was unable to perform any work were

1  inconsistent "with the greater objective record." (*Id.*)  The ALJ also stated that
2  Dr. Koryakos "did not offer any specific laboratory or clinical findings to support his
3  assessed limitations." (*Id.*)  As an example, the ALJ cited a May 18, 2011 treatment note
4  that included "grossly normal neurological findings." (*Id.* (citing Admin. Hrg. Ex. 33F at
5  3).)

6  As Plaintiff argues, the ALJ erred in rejecting Dr. Koryakos's opinions as
7  inconsistent with the medical record and as unsupported by clinical findings.  Plaintiff
8  argues that it was error for the ALJ to reject Dr. Koryakos's opinions based on
9  inconsistency with the objective record and as unsupported by laboratory findings
10 because fibromyalgia does not produce positive laboratory tests or similar objective
11 evidence.[4]  (Doc. 25 at 17.)  The Commissioner does not address this argument in her
12 response. (Doc. 26 at 16-20.)  The Ninth Circuit has recognized that fibromyalgia eludes
13 objective measurement.  *See Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004)
14 ("Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within
15 much of the medical community.  The disease is diagnosed entirely on the basis of
16 patients' reports of pain and other symptoms."); *see also Jordan v. Northrop Grumman
17 Corp.*, 370 F.3d 869, 872 (9th Cir. 2004) (fibromyalgia's "symptoms are entirely
18 subjective.  There are no laboratory tests for [its] presence or severity"), *overruled in
19 non-relevant part by Abatie v. Alta Health & Life Ins. Co.*, 258 F.3d 955, 969 (9th Cir.
20 2006) (en banc); *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech.,
21 Inc.*, 125 F.3d 794, 796 (9th Cir. 1997) (same).

22 As the Ninth Circuit has explained, "[t]he American College of Rheumatology
23 [has] issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no
24 laboratory tests to confirm the diagnosis." *Benecke,* 379 F.3d at 590.  The accepted

---

[4] Although the ALJ did not find Plaintiff's fibromyalgia severe, he was required to consider it when determining whether she was disabled.  *See Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (recognizing that, if one severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis).

1  diagnostic test for fibromyalgia is that an individual must have pain in eleven of eighteen
2  tender points. *See Jordan*, 370 F.3d at 877; *see also Rollins v. Massanari*, 261 F.3d 853,
3  855 (9th Cir. 2001) (claimant had eleven of eighteen tender points). Here, Plaintiff had
4  sixteen of eighteen tender points and had chronic pain. (Tr. 731, 521, 523, 525, 531, 535,
5  716, 718, 725, 884-86, 888-89, 891-95, 897-99.)

Additionally, there are "clinical findings" to support the assessed limitations. Plaintiff had fibromyalgia, carpal tunnel, headaches, depression and anxiety. Treatment records reflect positive response to multiple fibromyalgia trigger points (Tr. 448-49, 452), lumbar paraspinal muscle tenderness (Tr. 454), elevated liver function tests (Tr. 476), low red blood cell, hemoglobin, and hematocrit tests (Tr. 498), neural foraminal narrowing and facet arthropathy on the cervical spine MRI (Tr. 509-10), decreased range of motion in the neck, back, and hips (Tr. 730), positive Tinel's and Phalen's signs in the left wrist (Tr. 731), a positive impingement sign in the left shoulder (Tr. 780), abnormalities in memory and concentration during psychiatric testing (Tr. 736), an MRI showing AC arthrosis in the left shoulder (Tr. 791), evidence of bulging discs and degenerative changes on an MRI of the cervical spine (Tr. 792), and median neuropathy of the wrist on an EMG test. (Tr. 795-96.)

Therefore, the ALJ erred in rejecting Dr. Koryakos's opinions. That error was not harmless because the vocational expert testified that an individual with the limitations that Dr. Koryakos assessed would be unable to sustain employment. (Tr. 80-81.) Accordingly, the Court reveres the Commissioner's disability determination.[5]

**VII.   Whether to Remand for Benefits or Further Proceedings**

Having found that the ALJ erred in assigning little weight to Dr. Koryakos's opinions, the Court reverses the Commissioner's decision. The Court has the discretion to remand the case for further development of the record or for an award benefits. *See Reddick*, 157 F.3d at 728. The decision to remand for benefits is controlled by the Ninth

---

[5] Having concluded that the ALJ committed reversible error by rejecting Dr. Koryakos's opinions, the Court does not need to reach Plaintiff's other claims of error. (Doc. 25.)

- 17 -

1  Circuit's "three-part credit-as-true standard." *Garrison v. Colvin*, 759 F.3d 995, 1020
2  (9th Cir. 2014). Under that standard, evidence should be credited as true and an action
3  remanded for an immediate award of benefits when each of the following factors are
4  present: "(1) the record has been fully developed and further administrative proceedings
5  would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient
6  reasons for rejecting evidence, whether claimant's testimony or medical opinion; and
7  (3) if the improperly discredited evidence were credited as true, the ALJ would be
8  required to find the claimant disabled on remand." *Id.* (citing *Ryan v. Comm'r Soc. Sec.*,
9  528 F.3d 1194, 1202 (9th Cir. 2008)); *see also Benecke*, 379 F.3d at 595.

10  Plaintiff has satisfied all three criteria of the credit-as-true rule. On the first factor,
11  there is no need to further develop the record. *See Garrison*, 759 F.3d at 1021 (citing
12  *Benecke*, 379 F.3d at 595) ("Allowing the Commissioner to decide the issue again would
13  create an unfair 'heads we win; tails, let's play again' system of disability benefits
14  adjudication.")). On the second factor, the ALJ failed to provide legally sufficient
15  reasons for rejecting the opinions of treating physician Dr. Koryakos. On the third factor,
16  if the discredited evidence were credited as true, the ALJ would be required to find
17  Plaintiff disabled on remand because the vocational expert testified that a person with the
18  sitting, standing, and walking and limitations that Dr. Koryakos identified would be
19  incapable of sustained full-time work. (Tr. 80-81.) Therefore, based on this evidence,
20  Plaintiff is disabled. *See Garrison*, 759 F.3d at 1022 n.28 (stating that when the
21  vocational expert testified that a person with the plaintiff's RFC would be unable to
22  work, "we can conclude that [the plaintiff] is disabled without remanding for further
23  proceedings to determine anew her RFC.").

24  Having concluded that Plaintiff meets the three criteria of the credit-as-true rule,
25  the Court considers "the relevant testimony [and opinion evidence] to be established as
26  true and remand[s] for an award of benefits[,]" *Benecke*, 379 F.3d at 593 (citations
27  omitted), unless "the record as a whole creates serious doubt as to whether the claimant

1   is, in fact, disabled with the meaning of the Social Security Act." *Garrison*, 759 F.3d at
2   1021) (citations omitted).

3   Considering the record as a whole, there is no reason for serious doubt as to whether Plaintiff is disabled. *See Garrison*, 759 F.3d at 1021 (stating that that when the court conclude "that a claimant is otherwise entitled to an immediate award of benefits under the credit-as-true analysis, [the court has] flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."). The ALJ failed to set forth specific and legitimate reasons supported by substantial evidence for rejecting Dr. Koryakos's opinions. When a hypothetical question was posed to the vocational expert incorporating limitations that Dr. Koryakos identified, the vocational expert testified that such limitations would preclude Plaintiff from working. (Tr. 80-81.) On the record before the Court, Dr. Koryakos's opinions should be credited as true and the case remanded for an award of benefits.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying benefits is reversed and this matter is remanded for an award of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 19th day of February, 2015.

_____
Bridget S. Bade
United States Magistrate Judge